**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Criminal Case No. 20-CR-55-REB

**UNITED STATES OF AMERICA**,

        Plaintiff,

v.

**LAWRENCE MARTIN BIRK**,

        Defendant.

---

## UNITED STATES' SENTENCING STATEMENT

---

Immediately after a jury found him guilty of a felony, Defendant defied the Court's Order to voluntarily surrender his firearms, turning over only some of his guns to the Park County Sheriff's Office.  Following sentencing, Defendant decided that rather than report to prison, he was going to take what he calls a "vacation."  He changed the license plate on his car and packed for the inevitable confrontation with the United States Marshals tasked with finding him.  Defendant's arsenal included a fully automatic M-16 rifle and over 1,000 rounds of .223 ammunition.  Although the military veteran was sure to be the rifleman, this was not a solo mission; Defendant enlisted his wife, a vulnerable adult, to ride shotgun.  Any doubt as to whether Defendant intended to safely surrender his wife to the care of the pursuing Marshals is resolved by the rest of the packing list—a *pair* of all of the essential barricade/standoff equipment: two pistols, two bulletproof vests, two ballistic helmets, and two gas masks.

Defendant's conduct, the capstone of his decades-long defiance against the federal government, is as serious as "mere possession" can get—he violated a court order so he could keep his guns and use them against federal law enforcement.  What the PSR describes as a potential "tragedy" was averted by the good fortune that the Marshals ambushed Defendant when he was separated from his heavy weaponry.

Although the gravity of Defendant's failure to report to prison pales in comparison to his firearms possession, it is still serious.  After decades of evading his obligation to pay taxes, Defendant went to trial with the assistance of two attorneys, a certified financial examiner, and a litigation support professional, all provided by the taxpayers.  Even after the verdict and sentencing, the Court allowed him to remain at liberty and self-report to prison.  In return, Defendant exhibits only contempt for the Court and the advocates who have been zealously representing him.  Rather than surrender as ordered (never mind make arrangements for his wife's care or his substantial restitution), Defendant went on a "vacation," using Social Security payments to fund his hotel stays and restaurant meals.

Defendant's egregious conduct merits a substantial additional sentence.  The United States recommends a consecutive term of 60 months' imprisonment.  This falls toward the lower end of Offense Level 23, the Guidelines range the parties estimated in the plea agreement.

**Defendant's Arsenal**



**Defendant's "Vacation"**



Blue Line = License Plate Reader Hits; Purple Line = Financial Transactions; Red Line = Cell Phone Pings

# <u>**Table of Contents**</u>

<u>I.</u>   <u>Sentencing guidelines</u> ...............................................1

a.   Defendant Possessed Firearms in Connection with Another Felony 2

b.   The New Sentence Should Run Consecutively to Defendant's Tax Evasion Sentence .........................................................................5

<u>II.</u>   <u>Other Sentencing Factors</u>........................................6

a)   The FTA Count ................................................................6

*1.   The nature and circumstances of the offense* .................................. 6

*2.   The history and characteristics of the defendant*............................. 8

*3.   The need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment* ....................................... 9

*4.   The need for the sentence imposed to afford adequate deterrence* ............. 10

*5.   The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct* .............................. 11

b)   The FIP Count ................................................................ 12

*1.   The nature and circumstances of the offense* ................................ 12

*2.   The need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment* ....................................... 15

*3.   The need for the sentence imposed to afford adequate deterrence* ............. 16

*4.   The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct* .............................. 16

<u>III.</u>   <u>Defendant's COVID-Related Argument</u> ..................17

<u>IV.</u>   <u>Conclusion</u>..........................................................17

### I.   SENTENCING GUIDELINES

The parties and Probation all agree that the Total Offense Level is at least 22. With respect to Count One of the Information, unlawful possession of a firearm in violation of 18 U.S.C. § 922(g)(1) (the "FIP Count"), Probation and the parties all agree that the Base Offense Level is 20.  *See* USSG § 2K2.1(a)(4)(B), Plea Agreement [#33] at 7, and PSR [#40] at ¶¶ 25-27.  As the PSR explains, both prongs of USSG § 2K2.1(a)(4)(B)(i) apply because: (I) Defendant's .223 caliber rifle was capable of accepting a large capacity magazine (in fact, Defendant possessed nine loaded 30-round magazines with the rifle) and (II) it was a "machinegun" as described in 26 U.S.C. § 5845(a)(6) (it was modified to fully automatic).  PSR [#40] at ¶¶ 26-27.  Probation and the parties also agree that a two-level enhancement applies because Defendant possessed a total of three firearms.  *See* USSG § 2K2.1(b)(1)(A), Plea Agreement [#33] at 7 and PSR [#40] at ¶ 28.  Although the Plea Agreement did not address the adjustment for commission of an offense while on release, USSG § 3C1.3 (the "On Release Adjustment"), Probation and the parties now agree that this provision applies. *See* Defendant's Reply to the Government's Objection to the PSR [#38] at 2 and PSR [#40] at ¶¶ 32-34, 40.  In the Plea Agreement, the parties did not estimate the Offense Level for Count One of the Indictment, failure to appear in violation of 18 U.S.C. § 3146(a)(2) (the "FTA Count").  However, Probation and the parties all agree that the FIP Count does not result in a grouping enhancement.  *See* Plea Agreement [#33] at 7 and PSR [#40] at ¶ 44.  Finally, Probation and the parties agree that Defendant should receive a three-level reduction for acceptance of responsibility.  *See* USSG § 3E1.1, Plea Agreement [#33] at 8 and PSR [#40] at ¶¶ 47-48.

### a. Defendant Possessed Firearms in Connection with Another Felony

There is some dispute, however, regarding the four-level enhancement under USSG § 2K2.1(b)(6)(B), which applies to defendants who unlawfully possess a firearm "in connection with another felony offense" (the "ICW Enhancement").  Probation declined to apply the ICW Enhancement because "the probation officer fails to see how the firearms emboldened the offense of failure to surrender to the BOP," PSR [#40] at ¶ 29, and the United States offered its contrary view in its Objection to the PSR [#37].  Although the parties initially agreed that the ICW Enhancement was appropriate, *see* Plea Agreement [#33] at 7, Defendant now argues that it "is inapplicable and [the On Release Adjustment] applies instead."  ECF #38 at 2.  Defendant further argues that "it makes no sense to apply both [the ICW Enhancement and On Release Adjustment]" and that doing so "is an impermissible double counting" that would punish Defendant "twice for the same conduct."  *Id.*  The United States already explained why the facts of this case and the law of the Tenth Circuit support the application of the ICW Enhancement in its Objection to the PSR [#37] and will now address Defendant's new arguments about "double counting."

Chapter One of the Guidelines sets forth the instructions for appropriately calculating a defendant's offense level.  *See* USSG § 1B1.1(a) (first, determine the base offense level and appropriate specific offense characteristics in Chapter Two; then apply the Chapter Three adjustments).  The Commentary further explains that "[a]bsent an instruction to the contrary, enhancements under Chapter Two, adjustments under Chapter Three, and determinations under Chapter Four are to be applied cumulatively."  USSG § 1B1.1, comment. (n.4(B)).  The commentary goes on to acknowledge—and

disregard—Defendant's concern about cumulative enhancements and adjustments that result from the same conduct.  *See id.*  In sum, absent a contrary instruction, the Commission intended for the type of "double counting" Defendant raises.

Although perhaps foreclosed by a mechanical application of the Guidelines, Defendant's "double counting" argument is not without merit, as the Tenth Circuit recognizes that overly rigid applications of the Guidelines can lead to impermissible "double counting" when "separate enhancement provisions [] necessarily overlap, are indistinct, and serve identical purposes."  *United States v. Rucker*, 178 F.3d 1369, 1371 (10th Cir. 1999).  All three of these criteria must be met for the use of separate enhancements to constitute impermissible double counting.  *Id.*  Although this appears a close case (the government acknowledges the intuitive appeal of Defendant's argument), careful examination reveals that none of the three required criteria are met.

The application of the ICW Enhancement and On Release Adjustment do not "necessarily overlap" because there are myriad situations where a defendant in similar circumstances could find himself subject to the On Release Adjustment (which simply applies automatically to defendants who commit an offense while on release status) but not an ICW Enhancement.  For example, had Defendant brought only ammunition on his "vacation," the On Release Adjustment would apply but the ICW Enhancement would not, as the ammunition alone would not have emboldened him.  Essentially, Defendant is asking the Court to impose the offense level that would apply if either the Court accepted Probation's view that the firearm possession did not embolden him, or if Defendant possessed three *unloaded* machineguns.

However, if the Court agrees with the United States' Objection to the PSR [#37] and concludes that the firearms did embolden Defendant, it would not be an impermissible double counting under Tenth Circuit law because the two provisions are based on separate factual findings and, therefore, do not "necessarily overlap."  In addition, the two provisions are distinct and serve to address different purposes.  The ICW Enhancement is based upon the *purpose* of Defendant's firearm possession (a criminal purpose is an aggravating sentencing factor), while the On Release Adjustment is based on Defendant's *status* (committing any crime while entrusted to a release status is a separate aggravating sentencing factor).  Consistent with their positioning in the Guidelines, the Chapter Two enhancement is tied to the nature of the crime itself, while the Chapter Three adjustment relates only to Defendant's release status.

It is entirely appropriate for the Court to subject Defendant to an enhanced Guidelines range if it finds, as the United States argues, that Defendant possessed the fully automatic assault rifle, loaded high-capacity magazines, thousand-plus rounds of .223 ammunition, flak jackets, ballistic helmets, and gas masks in anticipation of an armed standoff with federal agents.[1]  The Total Offense Level should be 26, resulting in a Guidelines range of 78-97 months, as Probation and the parties also agree that Defendant is in Criminal History Category III.

---

[1] On the other hand, if the Court agrees with Probation and concludes the Defendant's firearm possession was merely incidental to his felonious failure to surrender, it should only apply the On Release Adjustment.

### b. The New Sentence Should Run Consecutively to Defendant's Tax Evasion Sentence

The Plea Agreement did not resolve whether the instant sentence should run consecutively or concurrently with Defendant's prior tax evasion sentence, but the Sentencing Guidelines instruct as follows:  when "the instant offense was committed . . . after sentencing for, but before commencing service of, such term of imprisonment, the sentence for the instant offense shall be imposed to run consecutively to the undischarged term of imprisonment."  USSG § 5G1.3(a).  Although the Guidelines use mandatory language, the law is not entirely clear on whether the court has discretion to impose a concurrent sentence.  On the one hand, *United States v. Kieffer* suggests that courts do not have such discretion:

> Generally, a district court has broad discretion under § 5G1.3(c) in crafting a concurrent or consecutive sentence "to achieve a reasonable punishment for the instant offense."  Subsections (a) and (b), however, restrict that discretion. The former *requires* a consecutive sentence where the defendant committed the instant offense after being sentenced to serve another term of imprisonment.

681 F.3d 1143, 1167 (10th Cir. 2012) (emphasis added).

On the other hand, the *Kieffer* language is *dicta* and a more recent case seems to point in the other direction, noting that the Guidelines are only advisory and that 18 U.S.C. § 3584(a) gives sentencing judges discretion to impose a consecutive sentence under circumstances where the Guidelines would mandate a concurrent sentence.  *See United States v. Lymon*, 905 F.3d 1149, 1152-53 (10th Cir. 2018).

This legal ambiguity, however, only applies to the FIP Count.  The FTA sentence, on the other hand, must run consecutively to both Defendant's prior tax evasion sentence and any sentence imposed on the FIP Count.  *See* 18 U.S.C. § 3146(b)(2) ("A

term of imprisonment imposed under this section shall be consecutive to the sentence of imprisonment for any other offense.").

In sum, the Court should impose consecutive sentences, consistent with the Guidelines, because there is no basis for a departure or variance.  Should the Court impose such a consecutive sentence on the FIP Count, the government further recommends that the Court note that it would impose such a consecutive sentence even if it had the discretion to impose a concurrent sentence.[2]

## II.     OTHER SENTENCING FACTORS

In determining the appropriate sentence, the Court "shall consider" the factors enumerated in 18 U.S.C. § 3553(a).  Those factors counsel in favor of a harsh sentence, primarily because of Defendant's egregious offense conduct.

### a)  The FTA Count

#### 1.   *The nature and circumstances of the offense*

After perjuring himself at trial, Defendant was found guilty and promptly ordered to "inventory and identify with specificity make, model, caliber, or gauge of any firearm which he owns and which is in his possession."  7/25/2019 Trans. [18-cr-359 #131] at 616.  Although Defendant acknowledged that he understood this order, *id.*, which was a condition for his continued release, he immediately disobeyed it.  That is, the very same day, even before any discussion of sentencing, Defendant filed with the Court an

---

[2] The government also wishes to highlight Probation's view that the sentences on both counts must be consecutive: "Pursuant to the statutory punishment required under 18 U.S.C. § 3146(b)(2), as well as 18 U.S.C. § 3147, §3C1.3, and §5G1.3(a), all counts encompassed in the current matter must be imposed consecutively (and consecutive to the prior federal matter), and all sentencing enhancements related to 18 U.S.C. § 3147 and §3C1.3 must be consecutive as well."  PSR Exhibit A [#40-1] at R-3.

incomplete list of seven firearms, *see* Firearms Inventory [18-cr-359 #87], and subsequently surrendered the same seven firearms to the Park County Sheriff.

Although his continued defiance was concealed from the Court, the government, and defense counsel, it was obviously known to Defendant himself.  Nevertheless, throughout sentencing, his lawyer told the Court "he is not a hardened anti-government type" and "is chastened by this experience."  Defendant's Sentencing Statement [18-cr-359 #103] at 11 & 12.  And in a feigned attempt to demonstrate acceptance of responsibility or personal growth, Defendant apologized, said he was wrong, and then told the Court "The bottom line is we all live by the rule of law, plain and simple.  And so I stand here today repentant that I got involved in this."  10/30/2019 Trans. [18-cr-359 #108] at 17.  He said all this knowing that he still had the machinegun at home, ready to go.  This was not a genuine allocution; it was just another example of what the Court calls Defendant's "ends-justifies-the-means philosophy."  *Id.* at 34.

Defendant's motive for failing to surrender is no secret.  As he told his Probation Officer, he believes his tax evasion sentence was overly harsh because it deprived him of what would likely be his last years with his wife, and he would make the same choice again if given the opportunity.  *See* PSR [#40] at ¶ 65.  He made similar comments to his friends and family from prison.  *See* Affidavit of Supervisory Special Agent George Warnock ("Exhibit 1") at ¶ 12(d)(iii).  But this is not, as his lawyers argue, merely "an act of love."  Defendant's Motion for a Below Guidelines Sentence [#39] at 4.  While nobody questions Defendant's love for his wife, his actions are also another example of his defiance and selfishness.

Defendant's strategy for his tax evasion sentencing was a selfish one.  By purposely failing to plan for his wife's care, he could argue his care was essential.  *See, e.g.*, Defendant's Sentencing Statement [18-cr-359 #103] at 10 ("A prison sentence would leave her alone and with nobody to care for her.") and 16 ("Nobody else in the family is present or able to care for her."); 10/30/2019 Trans. [18-cr-359 #108] at 6-7 ("The fact is that the family cannot [assume care responsibility for Defendant's wife], that it would be impracticable, and that it is absurd to assume otherwise.") & 10 ("It should be plain that if they were actually able to care for their sibling, they would have so asserted in those letters.  Pointedly, they did not.  They cannot and apparently will not uproot their lives to do that.  It's just a fact.  It's not a judgment.  It's just a fact."). This strategy was not only unfair to his wife (and those who would be left to care for her) but also disingenuous, as Defendant concedes that he was no longer able to take care of her himself, and he takes comfort in knowing that she now receives appropriate care in a memory care facility.  Exhibit 1 at ¶ 12(g).  Defendant's failure to plan for his wife's care continued after sentencing and resulted in him taking her on a "vacation" that he concedes was "pretty tough on her" (to say nothing of the extra pistol, bulletproof vest, ballistic helmet, and gas mask).  *Id.* at ¶ 12(a)(ii)(1), (2).  Defendant's failure to plan for his wife's care resulted in those responsibilities falling to his in-laws.

2. *The history and characteristics of the defendant*

Defendant's history and characteristics were thoroughly briefed in advance of his tax evasion sentencing.  Suffice it to say, it is not so remarkable to justify a variance in either direction.

> 3. *The need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment*

It is easy to understand and empathize with Defendant's "act of love."  But a system of laws, especially one that entrusts citizens to follow the law voluntarily (whether it involves declaring their income and paying taxes, or surrendering firearms and reporting to prison), must impose meaningful sanctions for those that violate it.  And Defendant's violation was egregious.  The Court's findings at Defendant's tax evasion sentencing speak to this:  "The law, for good reason, does not deal kindly with someone who arrogantly believes he is above the law, immune to its application, and better and smarter than millions of taxpaying people."  10/30/2019 Trans. [18-cr-359 #108] at 36.

The failure to voluntarily report to prison—an offense against the administration of justice—is inherently serious.  In this case, Defendant abused the trust of the Court, which offered him the privilege to remain at liberty and self-report to prison.  This privilege would have been very useful to an offender who was legitimately engaged in the process of making arrangements for a vulnerable family member, but it was squandered.  The seriousness of this count is reflected in the Guidelines base offense level of 11, which is adjusted to 14 after accounting for the On Release Adjustment.  Were it not for the FIP Count, Defendant's Total Offense Level would have been 12, after accounting for acceptance of responsibility, with a Guidelines range of 15-21 months in prison.  This range reflects the kind of sentence Defendant knowingly bargained for when he decided to run, knowing he would ultimately be caught and have to serve additional time.  *See* Exhibit 1 at ¶¶ 9 (telling the Marshals he knew they would eventually catch him) & 12(a)(iii) (acknowledging, even before he was charged, that he would face additional charges for his "vacation").  Defendant now proposes an

"incremental" increase on his tax evasion sentence by an additional term of 18 months. The United States submits, in line with Probation's recommendation and the Guidelines, that such a sentence would be sufficient only if the FTA Count stood alone.

While Defendant's desire to spend time with his wife may be heartwarming, it is not mitigating, especially not for a man whose underlying crime of conviction was motivated by the same selfishness and defiance.  This is not the first time Defendant has chosen to defy the law when its fair application would inconvenience him, but it must be the last.  Although many expected Defendant's tax evasion sentence would have deterred him, *see, e.g.*, 10/30/2019 Trans. [18-cr-359 #108] at 36 ("This protracted and presumptuous violation of settled federal law must end.  And today, 20 years, two decades, of prodigal lawlessness comes to an end.") (findings of the Court), Defendant has proven himself a law-defying recidivist, increasing the need for punishment.  Finally, the need for a sentence to promote respect for the law is increasingly important when imposed against a person who so brazenly continues to flout it.

### 4.  The need for the sentence imposed to afford adequate deterrence

The United States is not confident that any sentence will specifically deter Defendant.  With respect to general deterrence, the government only wishes to echo its previous arguments about the tax defier community's focus on these cases.  While Defendant complained about the representation from his "public pretenders," he asked his brother to engage a well-known tax defier lawyer, suggesting that Defendant is still engaged in this community—a community that the Court acknowledged during Defendant's tax evasion sentencing.  10/30/2019 Trans. [18-cr-359 #108] at 36 ("make no mistake, they exist, and they are watching.") (findings of the Court).

It is also noteworthy that it is not uncommon (perhaps unsurprisingly) for tax defiers to flee after being convicted at trial.  Just by way of anecdote, government counsel is familiar with the relatively recent flights of Timothy Stubbs (D. Colo.), Ronald and Dorothea Joling (D. Or.), and Winston Shrout (D. Or.).  Although Stubbs was 52 years old when apprehended, Shrout and the Jolings were all in their 70s when they fled.  All of this is to say that the FTA sentence should be designed to afford general deterrence targeted to a community that desperately needs it.  The sentence should make it clear that a substantial sanction awaits those who choose to violate the trust of being released on bond, willfully break the law, and flee from responsibility.

> 5.  *The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct*

Candidly, the government does not have a firm handle on what a typical sentence is for someone who fails to report to serve a sentence.  Unlike Defendant, Stubbs and the Jolings all fled after their jury verdicts but before sentencing.  Although Shrout failed to report to begin serving his sentence, he has not been charged with FTA.  However, his initial sentence was ten years, he was over 70 when he was apprehended, and he was not armed to the teeth.

The government notes that the "Interactive Data Analyzer" on the Sentencing Commission's website reveals some information.  If filtered to show cases where a defendant was sentenced under Guideline § 2J1.6 and ended up in Zone D of the sentencing table, as Defendant (if only barely) would be if sentenced on the FTA alone, it shows that the average sentence was 17 months and the median was 18 months.

### b) The FIP Count

*1. The nature and circumstances of the offense*

Defendant's firearms offense is far and away the most serious conduct at issue in this sentencing hearing, and the FIP Count should drive the sentence. The evidence supports the finding—and the Court should thus find—that Defendant unlawfully possessed firearms with the intent to use them against law enforcement. No other plausible explanation fits the facts. Upon being adjudged guilty of tax evasion, Defendant defiantly held on to three of his firearms and, after receiving what he viewed as an unfair sentence, he took them on the run knowing full well that the Marshals would be in pursuit. These were not tokens of a cultural affinity for firearms. The kit he brought on "vacation" was purpose-built for a barricade situation. If it were only a pistol, one might think murder/suicide was on his mind, but the anticipation of a standoff is the only way to explain the machinegun, body armor, and gas masks.

Defendant's ideology is relevant because it further reveals this intent. Defendant now refers to himself as a "political prisoner," which is consistent with his long-held victimhood narrative. In March 2009, after years of receiving notices from numerous IRS collections employees, Revenue Officer Miller (who testified at trial) mailed Defendant notices that he had over $2M in unpaid taxes and that the IRS was preparing to initiate a civil suit to foreclose on his property. *See* 18-cr-359 Trial Exhibits 48 & 49 (attached as Exhibits 2 & 3). In response, Defendant wrote that her "letters clearly show the intent of the IRS to deprive us of property under *color of law.* Our position in this matter remains unchanged, and we will defend ourselves and our property by whatever means are necessary. It is the right of a sovereign people." 18-cr-359 Trial Exhibit 51

at 1 (attached as Exhibit 4).  He signed that letter with his name and fingerprint.  *See id.*
at 2.  In writing his Congressman about this—the "collusion on behalf of the courts"
among other grievances—he said that "the only non-violent option remaining" is for the
government to respond to his petitions, otherwise "the die will be cast, and we will
prepare to defend ourselves, and our property, in accordance with our solemn Oath.  It
is our Right as a sovereign people.  No Answers, No Taxes.  God will bless America but
only if our words and actions honor Him."  *Id.* at 3-4.  Defendant also wrote a
threatening letter to Appeals Officer Bentley (who also testified at trial) noting that "Any
actions by this government, it's [sic] officers or agents, to deprive us of property, liberty
or our very lives, will be taken under *color of law*, a crime, and therefore, <u>will be</u>
<u>resisted</u>."  *Id.* at 7.  Having sent letters like this, Revenue Officer Morgan (another trial
witness) got approval to bring an armed escort with her when she served papers on
Defendant.  *See* Exhibit 5.  Defendant responded by complaining to the Park County
Sheriff, *id.*, and bragging to his son that he told the Sheriff he would probably shoot the
next person the Sheriff allowed on his property.  *See* Warnock Affidavit from tax evasion
sentencing (Exhibit 6) at ¶ 3.

Despite his phony sentencing allocution, Defendant's conviction has not
tempered his beliefs.  His hatred of the government has only grown.  *See* Exhibit 1 at
¶ 12(c)(i) & (ii).  Of particular concern is his seeming reverence for his former cellmate,
an alleged terrorist accused of shooting a dozen people at a Colorado Springs Planned
Parenthood clinic in 2015.  *See id.* at ¶ 12(c)(i)(iii).

Defendant claims that "[v]iewed in the broader context of [his] apocalyptic world view, the weapons possession too is understandable," before highlighting the fact that no standoff or murder/suicide actually occurred.  Defendant's Motion for a Below Guidelines Sentence [#39] at 2.  Of course, everyone is relieved that Defendant, his wife, and pursuing law enforcement were unharmed, and there is no denying that Defendant surrendered peacefully and was polite to the arresting officers.  That is why he was not charged with shooting anyone and is guilty only of possession.  However, "mere possession" does not get more serious than this.  The *reason* a firearm was unlawfully possessed is certainly relevant to sentencing.  Illegally possessing a gun for hunting is one thing.  Possessing it with the intent to sell it is worse.  Worse still is to possess a gun with the intent to use it to project power in a criminal enterprise.  But what could be worse than possessing it with the intent to use it against law enforcement?  The government's position is that Defendant hid his machinegun from the Court, failed to surrender it, and took it with him on "vacation" for the purpose of using it—in the terms of his victim narrative—to "defend" himself, i.e. to gun down pursuing federal officers.  That intent is revealed by the facts and circumstances, as well as Defendant's increasingly radicalized ideology.

In many circumstances, a person's failure to do something might serve as evidence that the person never intended to do it.  But not here.  In this case, the peaceful end to this saga was tactically necessary.  Whatever plan Defendant had in mind when he packed his arsenal, it was not available to him when the Marshals arrested him.  At least four heavily armed and armored federal agents ambushed him when he was between trips to his car.  He was apart from his heavy weaponry, armor,

and gas masks when the agents collapsed on his position in the motel room.  There was a sidearm in the room, but it was not on his person and the agents had eyes on him at all times.  Fortunately, these circumstances made it impossible for Defendant to carry out any violent plans he may have had, leaving peaceful surrender as his only option (save, perhaps, what is now known as "suicide by cop").

The nature and circumstances of this offense constitute the most significant § 3553(a) factor for the Court to consider.  Defendant's history and characteristics have already been discussed at length.  The remaining factors will be addressed briefly below, as they substantially overlap with the discussion in the FTA section above.

> 2. *The need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment*

The circumstances of this offense make it as serious as a FIP case can be. Respect for the law includes respect for those who enforce it.  United States Marshals and members of their fugitive task force put themselves at risk to bring absconders to justice.  When the license plate reader hit on Defendant's car, there was no indication that he would be waiting with a machinegun.  It is not hard to imagine what might have happened if that gun was in the room, if Defendant heard the Marshals coming, and had time to gear up.

The type of sentence that would afford "just punishment" is rather subjective.  It depends on what sentence the parties, society and, ultimately, the sentencing judge determines "fits the crime."  It is worth mentioning that even Defendant seems to expect a Guideline sentence in this case.  In communications with his friends and family, he predicts a sentence of between five and eight years.  *See* Exhibit 1 at ¶ 12(b).

3. *The need for the sentence imposed to afford adequate deterrence*

Although unlawful firearm possession is a relatively common federal offense, counsel assumes that taking up arms against the government is quite rare.  It must stay that way.  The sentence imposed must send a message to all—especially the already anti-government tax defier community that is surely watching this case—that only a harsh sentence awaits those who possess firearms with the intent to kill law enforcement officers.

4. *The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct*

The government again turns to the "Interactive Data Analyzer" on the Sentencing Commission's website.  When filtered to show defendants that are (a) sentenced under Guideline § 2K2.1, (b) in Criminal History Category III, and (c) have a resulting Total Offense Level that puts them in Zone D, the average sentence is 36 months and the median is 30 months.  As argued previously, the government believes this instance of unlawful firearm possession is much more serious than the average case and is, in fact, as bad as "mere possession" can get.

Although Defendant was charged with § 922(g)(1) (unlawful possession of a firearm by a felon), the Court might find sentencing statistics on defendants sentenced under § 922(g)(2) (unlawful possession by a fugitive) to be helpful.  Government counsel contacted the Commission for specific data on defendants sentenced under § 922(g)(2) and was told that such data was not publicly available.  However, the Commission further noted that such data may be available to a judge who makes a request for such non-public data.

### III.    DEFENDANT'S COVID-RELATED ARGUMENT

In fashioning an appropriate sentence, the Court should disregard Defendant's COVID-related argument that "[a]ny term of years today is exponentially more punitive than ever before."  After all, any consecutive sentence will not even begin to run until 2024, at which point, by any estimate, the global pandemic will be behind us.

### IV.    CONCLUSION

Now, this time, after running on his first sentence and taking up arms against the government, two decades of Defendant's prodigal lawlessness must actually come to an end.  The Court should sentence Defendant to a significant amount of additional time in prison.  Anything less than five years will not satisfy the goals of sentencing.[3]

**DATED** this 31st day of August 2020.

Respectfully submitted,

RICHARD E. ZUCKERMAN
Principal Deputy Assistant Attorney General
U.S. Department of Justice, Tax Division

By:  */s/ Christopher Magnani*
CHRISTOPHER MAGNANI
ELIZABETH HADDEN
Trial Attorneys, Tax Division
United States Department of Justice
150 M Street NE
Washington, DC 20002
Tel: (202) 307-6408
Fax: (202) 514-9623
Email: Christopher.Magnani@usdoj.gov

Attorneys for the United States

---

[3] Although the United States is more concerned with the total amount of additional prison time, Probation's recommendation of an 18-month term on the FTA count and 42-month term on the FIP count is satisfactory to the government.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 31, 2020 I electronically filed the foregoing with the clerk of court by using the CM/ECF system which will send a notice of electronic filing to the attorneys of record.  I also emailed a copy of this filing to Assistant Public Defenders Edward Harris and Jennifer Beck, counsel for the Defendant.

*/s/ Christopher Magnani*
Christopher Magnani
Trial Attorney, Tax Division
United States Department of Justice
150 M Street NE
Washington, DC 20002
Tel: (202) 307-6408
Fax: (202) 514-9623
Email: Christopher.Magnani@usdoj.gov
