1. I am a Supervisory Special Agent employed by IRS Criminal Investigation. Prior to becoming a manager, I was assigned the investigation of Lawrence Birk (Defendant) after the originally assigned Special Agent left the IRS.

2. I was in the courtroom when the jury found Defendant guilty of tax evasion and the Court ordered him to surrender his firearms. I was also in the courtroom when Defendant was sentenced in that case, 18-CR-359.

3. After Defendant failed to surrender, I made investigative contacts with the following individuals and others.
    a. Ryan Kinsella – Senior United States Probation Officer
    b. Gillian Fleck – United States Marshal
    c. Marty West – United States Marshal
    d. Paul Joanos – United States Marshal
    e. Henry Magdanz – Defendant's friend, who lives at Defendant's home
    f. David Birk – Defendant's Brother
    g. Kent Nowak – Defendant's brother-in-law
    h. Carol Congdon – Defendant's sister-in-law
    i. Michael Barrera – SIS Technician, Bureau of Prisons
    j. Bob Robinson – Defendant's friend
    k. Nord Hjerald – Defendant's friend
    l. Sgt. Hubbard – Tallahassee Police Department
    m. Richard Congdon – Defendant's brother-in-law
    n. Dave Williams – Defendant's friend

4. Based on these contacts, I obtained the following information about events that transpired between November 2019 and August 2020.

    Defendant Failure to Report for Prison and Subsequent Arrest

5. Multiple individuals talked to Defendant on or about the days leading up to November 21, 2019 (the day he was supposed to report to prison) and, by all accounts, Defendant indicated that he was planning to self-report. According to Defendant's roommate, the last time Defendant and his wife were at the house was the morning of November 18, 2019. The roommate had left to run some errands that morning and when he returned home Defendant and his wife were gone, as was their Honda Accord.

6. The United States Marshals used a variety of means to locate Defendant after he failed to report to prison. These included cell phone pings and historical phone records, and analysis of bank records. After securing video footage of Defendant at a motel, the Marshals learned that Defendant was using a different license plate, an Oregon plate that had not been registered for a number of years. The Marshals entered the Oregon plate into NCIC along with the valid Colorado plate so that if the vehicle was stopped the officers would know about the warrant. This also allowed the Marshals to track Defendant by using license plate readers.

It appears that Defendant used the Oregon plate for a while but then switched back to the original Colorado license plate. The Marshals determined that Defendant made a loop of the united states during his time on the run, which is documented in the attached map (Attachment 1). He drove from Colorado to Virginia (where his mother lives), back to Colorado, back to Virginia, and out to Arizona. The Marshals do not know how Defendant traveled from Arizona (where a debit card transaction placed him on January 11) and Florida (where he was arrested on January 30).

7. On January 30,2020 the Leon County Sherriff's Office in Florida was using a mobile license plate reader in the parking lot of a Howard Johnson motel and got a hit on a Defendant's Colorado license plate, showing Defendant's outstanding warrant. Members of the Sheriff's Office, Tallahassee Police Department, and the US Marshals ("Task Force" officers) responded to the motel. Upon arrival, members of the arrest team set up surveillance of the room that Defendant's vehicle was parked in front of and also spoke to the motel manager, confirming that Defendant was staying at the motel. Task Force officers saw Defendant exit his room and then return to the room.

8. I watched footage from two of the officers' body-worn cameras as they set up on the motel room behind a ballistic shield. The video depicts at least four officers knocking on the door, noting that they can see the Defendant through the window, Defendant putting up two fingers and then opening the door. Approximately 20 second elapsed between the time of the knock and Defendant's arrest. Defendant's wife was seated on the motel bed. These screenshots from the body-worn camera videos depict the arrest, showing the motel room, window they saw Defendant through, and where his wife was sitting.







9. Upon being taken into custody, Defendant told the Task Force officers that he would not harm law enforcement and that he had "too much respect for you guys." After he was in custody and searched, Defendant was placed back in the motel room with his wife. He was very cooperative during the arrest and was mostly concerned with what was going to happen to his wife. A pistol was found on the nightstand next to the bed in the motel room and Defendant informed the officers that he also had firearms in his car, including a long gun. He also said he knew he would get caught because the Marshals are good at their jobs and that he wanted to do some sightseeing before going to prison.

10. A search warrant was executed on Defendant's vehicle before releasing it to family members. In the trunk of the vehicle, among other items, were a fully automatic rifle, a pistol, magazines for the rifle and pistol, over 1,000 rounds of ammunition, two ballistic vests, two helmets, two gas masks, and an Oregon license plate. A photo of the recovered items is attached (Attachment 2).

11. Defendant was booked into the Federal Detention Center (FDC) in Tallahassee, on or about February 3, 2020. He was moved through a number of different facilities until arriving at the Federal Detention Center in Englewood, CO on or about February 21, 2020. He was transferred to the Federal Correctional Institution in Englewood, CO in July of 2020 and currently resides there.

12. I obtained from the Bureau of Prisons a number of recorded phone calls and emails between Defendant and his friends and family. I have reviewed many of these phone calls and emails and summarize them as follows (organized by topic):
    a. Time on the run
        i. In numerous communications, Defendant refers to the time he spent absconding as his "vacation."
        ii. In numerous communications, both before and after he was charged with failure to appear and firearms possession, Defendant has expressed that he does not regret taking his "vacation," as the time spent with his wife was uniquely valuable to him. For example:
            1. On a March 6 call, Defendant said "I have to admit that taking [Defendant's wife] on that journey like I did was pretty tough on her but we did have a good time. You know, nobody should underestimate that. Almost 20,000 miles, three oceans, national parks, we had a good time together."
            2. On a March 8 call, he said "[his wife] was getting pretty far out there towards the end of our, we'll call it a vacation. I'll tell you what, that's ten weeks they can't take back from me. We had one heck of an adventure. It was crazy. I'll tell you more about it some day but this isn't the right place to do it."
        iii. In numerous communications, even before he was charged, he acknowledged that his "vacation" would result in additional charges.

      iv. In a June 19 email, he cites the Guidelines range sentence, the five and ten-year statutory maximum penalties, the Court's discretion to run the sentences consecutively, but says "at least I got ten more weeks with my wife I will never see again. Well worth it."
- b. Expectation of additional sentence
    - i. In numerous communications, Defendant expresses the belief that he will be sentenced a significant term of additional incarceration. For example:
        1. In a May 12 email, Defendant wrote "I expect this judge (same one…) to slam me again. At this point it will be a miracle if I see daylight again."
        2. On an April 30 call, he predicted that his change of plea on the new counts will "give [him] another five years probably."
        3. In a May 3 email, he predicted a 7-8 year sentence.
        4. In June 12 and 19 emails, he predicted a sentence of ten years total and five additional years, respectively.
- c. Ideology
    - i. In numerous communications, Defendant expresses dismay with the United States people and government. For example:
        1. On a March 6 call, Defendant says "God is going to judge this country and it's not going to be a pretty sight. . . ."
        2. On another March 6 call defendant says "I had little or no faith left in the American people as it was and now I have none. Zero. Ziltch. Or the government that represents them."
        3. On an April 6 call, he said "the American people have no idea what they've done with their government, this is the most evil thing that's ever happened on this planet, it's as bad as Nazi Germany because they just do it in a very quiet subtle way so most Americans have been lulled asleep. Hitler wasn't a subtle guy, he did things right up front. I bear this country no allegiance, or the American people, they can all die."
        4. In a July 16 email, he wrote "If I ever get out of here, I will never again stand for that rag or the song that they play... the Amerikan "sheeple" can kiss my unwashed ass. I don't owe this country anything..."
        5. On a July 27 call, he said "I'm going to be very very harsh from this point forward, It's not my country anymore."
    - ii. Defendant often expresses his Christian faith and has extensive conversations about religion and the Bible with friends from his Church community.
        1. One of Defendant's friends consistently engages him regarding his interpretation of Romans 13, "Submission to the Authorities." Defendant explained, in a May 21 email: "My view of Romans 13 is very simple. The Throne is vacant and has been since the last king of Judah was hauled

off into captivity… never to return.  Our Lord and King will reclaim the Throne at the beginning of the 1000 year reign.  The European kings have no claim over us and the US is ruled by Law, not by men.  The current govt is evil... if it were only for the murder of the most innocent amongst us... plain and simple. We are to obey God not men.  Period.  There is no doctrine of blind obedience."

   iii. Defendant shared a cell with Robert Dear, who is accused of shooting twelve people at a Planned Parenthood clinic in Colorado Springs.
1. In an April 18 email, he said sharing a cell with Dear was a "saving grace," and he described Dear as a "solid Christian man with principles."
2. In an April 20 email to the same friend, he encouraged the friend to look Dear up, calling Dear an "interesting guy."
3. In an April 23 response, his friend reveals that he knows Dear and says "At least you should not be at each others throats.  Yes, I recall all the details; I'll bet you two are getting on well.  Good.  We don't get to do Jesus job; only His work."
4. In a July 20 email, the same friend asked if Dear was "still part of your posse?"

   iv. Taxes
1. Early communications often focused on how to prevent the IRS from taking Defendant's home.
2. In an April 14 email, Defendant said he knows Lowell "Larry" Becraft, who is known as a "tax defier" attorney within the tax enforcement community.  Mr. Becraft has been sanctioned for making 16th Amendment arguments on behalf of a client in a criminal tax case.  Mr. Becraft was also called by a former client as a witness in a criminal tax trial and, on cross, he asserted his Fifth Amendment rights when asked if he files a Form 1040.

d. Deflection of responsibility
   i. In March 17 and May 24 emails, Defendant describes himself as a "political prisoner."
   ii. In several communications, Defendant blamed his ex-wife and son for the sentence in his tax case.  For example, in an April 11 email, he wrote "the comments made to the govt by [my son] and [ex-wife] seriously [sic] impacted the judge regarding his decision to give me the maximum.... five years.  In effect it negated about two dozen character reference letters."
   iii. In several communications, Defendant blamed the length of his tax evasion sentence for his failure to surrender.  For example, on a April 14 call, he said "This judge just slam dunked me like he did and a, because quite frankly that's what caused what happened

    next ya know if i'd a got some kind of reasonable sentence out of that I would've gone and done it ya know but this guy just screwed me you know and ah, oh well I kinda lost my mind as they say and off I went."
  iv. Defendant consistently refers to his attorneys as the "public pretenders" and, in numerous communications, complains about their representation.  For example, in an April 13 email, he wrote "my public pretenders have not made an effort to defend me in any way" and, in a May 24 email, he says he was "denied proper representation."
  v. Defendant has said he believes the Court is prejudiced against him.  For example, on a June 13 call, he said "this judge has it out for me.  The word is extreme prejudice he has shown towards me.  He totally ignored the sentencing report from the probation office ya know.  They recommended six months sentence I'd already be outta here by now and ya know two years probation and ahh the judge threw it away and gave me the maximum sentence so extreme prejudice is the word . . . I hope his bowels fall out."
e. Knowledge that his communications are monitored
  i. In numerous communications, Defendant expresses an inability to discuss certain topics and, in at least one instance in a May 21 email, specifically notes that his communications are monitored.
  ii. In all of the communications I reviewed, Defendant never made substantive comments about the pending charges.  He will, however, sometimes reference the conduct.  For example, in a July 20 email, he said he is no longer eligible for the prison camp facility because of his "vacation" and "that other thing too."
f. Family money and support
  i. In numerous calls, Defendant's brother tells him that he will buy Defendant's home at auction, should the IRS try to seize and sell it.  Defendant repeats this plan to his friend in another call.
  ii. In discussions about hiring private legal representation for sentencing, Defendant's brother says that he liked one lawyer who said he would charge $20,000 for the sentencing.  In follow up emails, his brother says "Moms on board" and "just let me know when and where to jump in.  I'll give Mom a heads up."
  iii. His mother and brother are both very loving and supportive.  He has reconciled with his daughter.  His mother is now free of cancer.
g. Wife's care
  i. Early communications were very focused on the logistics of providing care for his wife, who now lives at Lark Springs, a memory care facility in Colorado Springs.
  ii. On a March 9 call, Defendant acknowledged that he was beyond being able to take care of his wife himself.  See also (a)(ii)(1) and (2) above.

       iii. In a June 15 email, he recounted his hurt over losing guardianship over his wife, but noted his appreciation of "the fact that she is well cared for at the moment, and the situation was in fact becoming impossible under the circumstances."
       iv. There has been a lot of tension between Defendant's in-laws, who are taking care of his wife, and Defendant.

    I have read the foregoing statement consisting of 8 page(s), each of which I have signed. I fully understand this statement and it is true, accurate and complete to the best of my knowledge and belief.

*George Warnock*  08/27/2020

(Signature of affiant)





Attachment 2